UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------

IN THE MATTER OF THE APPLICATION OF
THE UNITED STATES OF AMERICA FOR
AUTHORIZATION TO INTERCEPT WIRE
COMMUNICATIONS OCCURRING OVER THE
CELLULAR TELEPHONE ASSIGNED NUMBER (917)
589-7000 WITH ELECTRONIC SERIAL NUMBER
("ESN") 02707430282

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
AUTHORIZATION TO
INTERCEPT WIRE
COMMUNICATIONS

--------------------------------------------------

STATE OF NEW YORK            )
COUNTY OF NEW YORK           : ss.:
SOUTHERN DISTRICT OF NEW YORK )

     MICHAEL SEIFER, a Special Agent with the Federal Bureau
of Investigation ("FBI"), being duly sworn, deposes and states:

### INTRODUCTION

    1.  I am an "investigative or law enforcement officer
of the United States" within the meaning of Section 2510(7) of
Title 18, United States Code, that is, an officer of the United
States who is empowered by law to conduct investigations of and
to make arrests for offenses enumerated in Section 2516, Title
18, United States Code.  I have been a Special Agent with the FBI
for approximately 2 and ½ years.  I have participated in several
investigations of Eurasian organized crime and, among other
things, have conducted or participated in surveillance, the
execution of search warrants, debriefings of informants and
reviews of taped conversations and business records.

    2.  I submit this affidavit in support of an
application for an order pursuant to Section 2518 of Title 18,
United States Code, authorizing the interception and recording of

wire communications concerning offenses enumerated in Section 2516 of Title 18, United States Code – that is, offenses involving wire, mail and bank fraud, conspiracy to do the same and attempts to do the same, in violation of 18 U.S.C. §§ 1341, 1343, and 1344 (the "TARGET OFFENSES").[1]

3.    I believe that there is probable cause to believe that these offenses have been committed, are being committed, and will continue to be committed by ALEX GORVITS, ALEKSANDR LIPKIN, a/k/a "Alex," a/k/a "Shorty," IGOR MISHELEVICH, PATRICK MULLINGS, FRANSWA LIGON, FUAD YAKUBOV, YAACOV FRIED a/k/a "Haim," JOHN GELIN, a/k/a "Buddha," DOUG ELLISON, and others unknown (the "TARGET SUBJECTS").

4.    The requested Order is sought for a period of time until the interception fully reveals the manner in which the above-named individuals and their confederates participate in the above-described offenses, or for a period of thirty (30) days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518(5).  Pursuant to Section 2518(5) of Title 18, United States Code, it is further requested that the 30-day period be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this

---

[1]    Although not a predicate offense under 18 U.S.C. § 2516, there is probable cause to believe that the TARGET SUBJECTS have aided and abetted and are aiding and abetting those substantive offenses, in violation of 18 U.S.C. § 2.

2

Court's Order or ten days from the date of this Court's Order.

5.    This case is being investigated by the Federal
Bureau of Investigation ("FBI"), Immigration and Customs
Enforcement ("ICE") and the New York City Police Department
("NYPD").

6.    I have personally participated in the
investigation of the offenses referred to in paragraph two above,
and make this affidavit based on my personal participation in
this investigation and based on reports made to me by FBI agents
and analysts and other law enforcement authorities.  Except where
otherwise noted, the information set forth in this affidavit has
been provided to me by other law enforcement agents who have
assisted in the investigation.  Unless otherwise noted, wherever
in this affidavit I assert that a statement was made, the
statement was made by another law enforcement officer (any of
whom may have had either direct or hearsay knowledge of that
statement) to whom I or other law enforcement officers have
spoken or whose reports I have read and reviewed.  Such
statements are reported in substance and in part, unless
otherwise indicated.  Likewise, information resulting from
surveillance sets forth either my personal observations or
information provided directly or indirectly through other law
enforcement officers who conducted such surveillance.

7.    Since this affidavit is being submitted for the

3

limited purpose of securing an order authorizing the interception

of wire communications, I have not included details of every

aspect of this investigation to date.    Facts not set forth herein

are not being relied on in reaching my conclusion that orders

should be issued.    Nor do I request that this Court rely on any

facts not set forth herein in reviewing this application for an

order authorizing the interception of wire communications.    Based

upon this knowledge, I allege the facts contained in the

paragraphs below to demonstrate that:

### DESIGNATED TELEPHONE

8.    There is probable cause to believe that evidence

of the commission of the TARGET OFFENSES will be obtained through

the interception of communications of the TARGET SUBJECTS and

others, including Akin Ayorinde, Umana Oton, and Alex Rozenzaft,

Mark Bratkovsky, Steve Bender, Serge Binder (the "INTERCEPTEES").

Furthermore, there is probable cause to believe that the TARGET

SUBJECTS have been using, are using, and will in the future use

the following telephone to make wire communications in

furtherance of, in connection with, to facilitate, to accomplish,

and to commit the TARGET OFFENSES:

a.    the cellular telephone assigned call

number(917) 589-7000, with ESN 02707430282, and service provided

by Verizon Wireless, which is subscribed to by Igor Mishelevich

at 2299 East 13th Street, Brooklyn, New York 11229 ("TARGET

4

CELLPHONE 2").

      9.  I have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack.  The cellular telephone system divides the New York City and other metropolitan area into many small coverage areas, which are called "cells." As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed.  Each portable cellular telephone that does not contain party lines bears a unique ESN or International Mobile Subscriber Identity ("IMSI") number and an assigned telephone number.  It is requested that interception be permitted over TARGET CELLPHONE 2, and any other telephone numbers accessed through the above-listed ESN number for TARGET CELLPHONE 2, and any ESN or IMSI number accessed through the phone number assigned to TARGET CELLPHONE 2. It is further requested that background conversations, in the vicinity of TARGET CELLPHONE 2 while it is off the hook or otherwise in use, also be permitted to be intercepted.

      10.  Because of the mobility of portable cellular telephones, pursuant to Title 18, United States Code, Section

2518(3), authorization is requested for interception of wire communications within the Southern District of New York, and outside that jurisdiction but within the United States in the case of a mobile interception device.

11.  It is anticipated that the subjects of this investigation will use TARGET CELLPHONE 2 to place calls and relay other electronic messages to and from New York, New York, as well as other locations.  This belief is supported by the facts described below.  Pursuant to <u>United States v. Rodriguez</u>, 968 F.2d 130 (2d Cir. 1992), a Court in the Southern District of New York is empowered to issue an Order for the interception of wire communications over telephones located in other districts, as long as the interceptions of these communications are first heard in the Southern District of New York.

12.  In connection with the telecommunication companies that provide the service for TARGET CELLPHONE 2, all interceptions will automatically be routed to New York, New York, regardless of where the telephone calls are placed to or from. Accordingly, all interceptions will first be heard in the Southern District of New York.

13.  During the requested wire surveillance, all monitoring will be performed in New York, New York, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the FBI, ICE

6

and government employees or individuals operating under a
contract with the government, who will be acting under the
supervision of investigative or law enforcement officers
authorized to conduct the interception.

## OBJECTIVES

14.    There is probable cause to believe that the
interception of wire communications, the authorization for which
is sought herein, will help to reveal: (I) the nature, extent and
methods of operation of the TARGET SUBJECTS' wire, mail and/or
bank fraud activities; (ii) the identities of the TARGET
SUBJECTS, their accomplices, aiders and abettors, co-conspirators
and participants in their illegal activities; (iii) the receipt
and distribution of contraband and money involved in those
activities; (iv) the locations and items used in furtherance of
those activities; (v) the existence and locations of records;
(vi) the location and source of resources used to finance their
illegal activities; and (vii) the location and disposition of the
proceeds from those activities.  In addition, these wire
communications are expected to constitute admissible evidence of
the commission of the above-described offenses.

## PRIOR APPLICATIONS

15.    I have been informed that reviews have been done
of the electronic surveillance files of Immigration and Customs
Enforcement, the Drug Enforcement Administration and the Federal

Bureau of Investigation.[2]  Based on these reviews, I have been informed that there have been no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS, except as noted below:

a.   On or about May 26, 2006, the Honorable Naomi Reice Buchwald, United States District Judge for the Southern District of New York, issued an order authorizing the interception of wire communications occurring over the cellular telephone assigned call number (917) 628-4994, with IMSI number 310150990342434, subscribed to by Alex Gorvits ("TARGET CELLPHONE 1").  Interception pursuant to that order ceased on or about June 25, 2006.  On or about June 26, 2006, the Honorable William H. Pauley III, United States District Judge for the Southern District of New York, issued an order re-authorizing the interception of wire communications occurring over TARGET CELLPHONE 1.  Interception pursuant to the June 25, 2006 order ceased on or about July 25, 2006.

I.   **THERE IS PROBABLE CAUSE TO BELIEVE THAT THE TARGET SUBJECTS WILL USE TARGET CELLPHONE 2 IN FURTHERANCE OF THE TARGET OFFENSES**

16.  As set forth in greater detail below, there is probable cause to believe that the TARGET SUBJECTS are participating in an ongoing mortgage fraud scheme and are using

---

[2]   A check of FBI, DEA and ICE files was completed on or about August 15 and 16, 2006.

8

TARGET CELLPHONE 2 to commit the TARGET OFFENSES.  Information

provided by two cooperating witnesses and a review of public real

estate related documents reveals that, since at least in or about

October 2004, ALEX GORVITS, ALEX LIPKIN and IGOR MISHELEVICH have

acted as mortgage brokers for numerous real estate transactions

in which they fraudulently obtained mortgage loans for amounts

greater than the purchase price of the underlying properties by,

among other things, submitting inflated property appraisals,

using "straw buyers" for the mortgage loans, and providing false

employment, asset and income information to the mortgage lenders.

Communications intercepted over TARGET CELLPHONE 1 confirm that

these activities are ongoing and currently involve several

different properties that we believe will be the subject of

purchase using fraudulently obtained mortgage.  In addition,

communications intercepted over TARGET CELLPHONE 1 have revealed

that PATRICK MULLINGS, FRANSWA LIGON, FUAD YAKOBOV, YAACOV FRIED,

JOHN GELIN, and DOUG ELLISON are actively involved in recruiting

"straw buyers" and/or falsifying the information submitted to

mortgage lenders in order to obtain mortgage loans for the TARGET

SUBJECTS.  Moreover, communications intercepted on TARGET

CELLPHONE 1 have revealed that MISHELEVICH is using TARGET

CELLPHONE 2 to communicate with ALEX GORVITS to commit the TARGET

OFFENSES, and telephone toll records indicate that MISHELEVICH is

also using TARGET CELLPHONE 2 to communicate with other TARGET

9

SUBJECTS.

A. **BACKGROUND INFORMATION ON THE TARGET SUBJECTS'
COMMISSION OF THE TARGET OFFENSES**

17. I and other law enforcement agents have
interviewed a cooperating witness ("CW-1"),[3] who has been
involved in several fraudulent real estate transactions with ALEX
GORVITS. CW-1 provided the following information:

a. ALEX GORVITS is employed by AGA Capital NY
Inc. ("AGA Capital") in Brooklyn, New York.

b. For the first five real estate transactions
that CW-1 participated in with GORVITS, CW-1 identified low value
properties that were for sale in Brooklyn, New York, and CW-1
also recruited individuals to serve as nominal, or "straw,"
buyers for each property. Each of these "straw buyers" had high
credit ratings and was paid a small fee for allowing GORVITS to
use their name and personal information. After the first five
transactions, GORVITS began supplying the straw buyers, and CW-1
was mainly responsible for identifying properties.

c. After a property was identified by CW-1 and a
"straw buyer" was recruited, GORVITS paid certain appraisers to
appraise the property at an inflated value. GORVITS then used

---

[3]    CW-1 has pled guilty in New York state court, pursuant to a
cooperation agreement, to three counts of criminal possession of
a weapon. CW-1 is providing information in hopes of receiving a
reduced sentence. The information provided to date by CW-1 has
in many instances been corroborated and has proven to be
reliable.

the inflated appraisal and the "straw buyer's" high credit rating
to obtain mortgages from out of state banks for the appraised
value of the property.

       d.    GORVITS convinced the sellers of each
property to close the transaction at a price greater than the
historical value of the property but less than the appraised
value.  GORVITS told the sellers that the additional amount of
the mortgage would be used to pay various fees, but, in truth,
GORVITS and his co-conspirators made a profit on the sale that
was equivalent to the difference between the inflated amount of
the mortgage and the actual price at which the property was sold.

       e.    If a down payment was required for the
purchase of the property, GORVITS and/or an attorney chosen by
AGA Capital would create a fake cashier's check, or "show check,"
in the name of the "straw buyer."  GORVITS would present the
"show check" to the mortgage bank.

       f.    After a property was bought in the name of a
"straw buyer," CW-1 usually would make a few mortgage payments
out of the profit received from the difference between the
mortgage and the actual sale price.  However, soon after the
transaction was closed, GORVITS would sell, or "flip," the
property to another "straw buyer" who had obtained a mortgage in
the amount of a further inflated appraisal of the property.

       g.    In many of the real estate transactions

completed by CW-1 and GORVITS, GORVITS also paid unusually high
fees to the title company and bank attorney who participated in
the transaction.  CW-1 identified Akin Ayorinde and Umana Oton as
two attorneys who GORVITS frequently hired to assist in his
fraudulent real estate purchases.

        h.   CW-1 also identified ALEKSANDR LIPKIN as a
mortgage broker who works with GORVITS at AGA Capital, and who
also engaged in fraudulent mortgage transactions.

        i.   CW-1 further identified PATRICK MULLINGS as a
real estate processor who found "straw buyers" for GORVITS.

        18.  I and other law enforcement agents have
interviewed another cooperating witness ("CW-2"),[4] who is
familiar with AGA Capital and its personnel.  Based upon my
conversations with CW-2, I have learned the following
information:

        a.   AGA Capital had several locations.  One
office was located at 20-54 86th Street, Brooklyn, New York.  The
other office was located at 2729 Coney Island Avenue, Brooklyn,
New York.

        b.   ALEKSANDR LIPKIN occupied a main executive

---

[4]   CW-2 pled guilty, pursuant to a cooperation agreement, to
one count of racketeering in the Eastern District of New York.
CW-2 is currently serving a term of five years' probation as part
of his sentence.  CW-2 is providing information pursuant to his
cooperation agreement.  The information provided to date by CW-2
has in many instances been corroborated and has proven to be
reliable.

office on the first floor of the 2729 Coney Island Avenue office.

        c.    LIPKIN told CW-2 that he had recently purchased a multi-million dollar home, and LIPKIN asked CW-2 for advice on how to hide LIPKIN's assets from law enforcement authorities.

        d.    CW-2 identified a photograph of IGOR MISHELEVICH as depicting an individual that he has seen at AGA Capital's 86th Street location.

        e.    CW-2 identified a photograph of ALEX GORVITS as depicting an individual who worked at AGA Capital's 86th Street location and currently works at AGA Capital's Coney Island Avenue location.

        19.   I have reviewed public records and other investigative reports relating to a series of real estate transactions involving a house located at 1370 Park Place, Brooklyn, New York ("1370 Park Place"). Based upon these records, I have learned the following information:

        a.    On or about November 15, 2004, 1370 Park Place was sold for approximately $565,000 to a "straw buyer" ("P-1") who had obtained two mortgages in the total amount of $565,000.  P-1 defaulted on the first mortgage payment.

        b.    Participants in the sale of the home included CW-1; ALEX GORVITS, who was the mortgage broker; Akin Ayorinde, who was the real estate attorney for the seller; and Umana Oton, who

was the real estate attorney for the borrower.

        c.   On or about April 4, 2005, P-1 had a telephone conversation with the analyst from the bank where the mortgage was obtained.  During that conversation, P-1 told the analyst, in substance and in part, that P-1 had let another person use his/her name and personal information to purchase 1370 Park Place, that P-1 did not live in 1370 Park Place, and P-1 had never seen the inside of the property.

        20.  I have reviewed public records relating to a series of real estate transactions involving a house located at 726 Monroe Street, Brooklyn, New York ("726 Monroe Street").  CW-1 has informed me that 726 Monroe Street was one of the properties that CW-1 purchased with ALEX GORVITS using a "straw buyer."  According to the records I have reviewed, 726 Monroe was sold twice on or about April 18, 2003 and a third time on March 31, 2005 for approximately $585,000.  The third buyer obtained two mortgages on the property in the total amount of $585,000. Umana Oton was listed as an attorney who worked on the second sale.  Participants of the third sale included, PATRICK MULLINGS, who was given a power of attorney by the seller of 726 Monroe; Akin Ayorinde, who acted as a real estate attorney; and Alex Rozenzaft, who acted as a notary.

        21.  I have reviewed public records (and used other investigative means) relating to a real estate transaction

involving a house located at 1919 Pacific Street, Brooklyn, New York ("1919 Pacific Street"). Based upon those records, I have learned the following information:

a. In or about October 2004, 1919 Pacific Street was appraised at a value of $450,000.

b. Based upon the appraised value, the purported buyer of 1919 Pacific Street ("P-2") obtained two mortgages in the total amount of $450,000 on or about April 21, 2005.

c. The mortgage loans were originated with AGA Capital, and the closing agent for the transaction was IGOR MISCHELEVICH.

d. A second appraisal of 1919 Pacific was completed on or about September 29, 2005, on behalf of the mortgage lender, and reflected a value of $240,000 for the property.

e. As of in or around December 2005, 1919 Pacific Street was in foreclosure with estimated losses of approximately $518,283.

22. I have reviewed public records (and used other investigative means) relating to a real estate transaction involving a house located at 8 Pleasant Place, Brooklyn, New York ("8 Pleasant Place"). Based upon those records, I have learned the following information:

a. In or about January 2005, 8 Pleasant Place

15

was appraised at a value of $490,000.

b.    Based upon the appraised value, P-2, who was the purported buyer of 8 Pleasant Place, obtained two mortgages in the total amount of $490,000 on or about February 3, 2005.

c.    The mortgage loans were originated as owner occupied primary residence loans and were brokered by IGOR MISHELEVICH of AGA Capital.

d.    P-2 never made a mortgage payment, defaulted on the loan and 8 Pleasant Place went into foreclosure.

e.    A second appraisal of 8 Pleasant Place was completed on or about September 9, 2005, on behalf of the mortgage lender, and reflected a value of $357,000 for the property.

f.    A review of the mortgage loan application for 8 Pleasant Place revealed that P-2 had provided false employment, income and financial information.  P-2 also falsely stated in the loan application that she intended to occupy the property as her primary residence. In fact, P-2 never occupied 8 Pleasant Place.

g.    As of in or around November 2005, 8 Pleasant Place remained in foreclosure with estimated losses of at least $250,000.

**B.    Communications Intercepted Over TARGET CELLPHONE 1**

23.    Communications intercepted over the TARGET CELLPHONE 1 reveal a pattern of telephone calls relating to the

16

fraudulent mortgage activities of the TARGET SUBJECTS.  I have reviewed logs and summaries of these calls completed by monitoring agents and translators,[5] and I have listened to the entirety of the recordings of many of these calls including the ones that are described below.  Where these calls are set forth in this affidavit, they are set forth only in substance and in part, and are subject to change upon further review.  Further, many of the calls are in code, and the summaries set forth below include, where necessary, my interpretation of that code.

24.  Calls intercepted over TARGET CELLPHONE 1 include the following:

a.  On June 5, 2006, at approximately 12:55 p.m., ALEX GORVITS received a call on TARGET CELLPHONE 1 from DOUG ELLISON [a person I believe to be involved in fraudulent mortgage activity with GORVITS].  During this call, DOUG ELLISON stated, "Tell me something good U/I."  GORVITS stated, "Hey what's up, Doug?  How are you?  No, everything with your deal, everything is on, is on, is on the move.  I spoke to Lucien she says everything goes well we should be closing this week.  All right?  Um, I've got other problems of my own."  ELLISON responded, "U/I," and GORVITS said, "I called actually to ask for your help.  If you

---

[5]    Many of the pertinent calls intercepted on TARGET CELLPHONE 1 are in Russian and English.  Translators fluent in Russian either monitored the intercepts as they occurred over TARGET CELLPHONE 1 or, if they were not reasonably available at the time of interception, translators reviewed and summarized recordings of the intercepts as soon as practicable after the interception.

17

could help me, I would really, really appreciate it.  Um, can you

get me a buyer?"  ELLISON said, "For?" and GORVITS replied, "For

a property . . . not permanently, for you know, just temporarily.

I don't want to say too much shit on the phone but, you, you know

exactly what I need.  The property that I am, you know . . . that

I am looking to buy, you know, hold it for about a year, resell

it, I just had one of my guys he fall through with it, fucking

score dropped [the credit score of the straw buyer that was going

to be used in this transaction had a credit score that was too

low]."  (Call #96)

        b.    On June 5, 2006, at approximately 8:46 p.m.,

GORVITS received a call on TARGET CELLPHONE 1 from YAACOV FRIED

a/k/a "Haim"  During this call, GORVITS and FRIED discussed

several properties and GORVITS stated, "On 1249 St. Johns

[referring to a property in Brooklyn that GORVITS and FRIED plan

to purchase by fraudulent means], I will try 700 if you want me

to change the appraisal to 700 [$700,000]."  FRIED responded,

"Which can you change to 700?  St. Johns?"  GORVITS said, "Yeah,

I can change it [change the appraisal].  If you want me to, I was

going to do it at 650 and leave $50,000 for equity [possibly to

allow them to extract $50,000 in cash to either possibly fund the

fraud or to keep as proceeds of the fraud]."  (Call #157)

        c.    On June 6, 2006, at approximately 3:09 p.m.,

GORVITS received a call on TARGET CELLPHONE 1 from Deb LNU.

During this call, Deb asked, "Is there any other property?"
GORVITS responded, "Do you guys do Manhattan? I have a property
at 243 West 98th Street, on the Upper West side. It's a condo,
rent controlled. I have an 87 year old lady in there that pays
me $452 in rent every month. My colleague [possibly referring to
ALEX LIPKIN] just recently bought it. . . and I'm looking to sell
it now. . . On that one, I need 1.65 [$1,650,000]." Deb stated,
"We'll definitely talk." GORVITS stated, "But, here's the deal.
Certain things, I don't want to say over the phone. This
apartment, you know, some people, what they try to do when they
buy, after they buy, they actually cash out. Have you heard of
that?" Based upon my training, experience and familiarity with
this investigation, as well as the guarded way in which GORVITS
speaks to Deb, I believe that this is another property that
GORVITS and the other TARGET SUBJECTS purchased by obtaining a
fraudulently obtained mortgage. (Call #222)

        d.   On June 6, 2006, at approximately 6:28 p.m.,
GORVITS received a call on TARGET CELLPHONE 1 from PATRICK
MULLINGS. During this call, MULLINGS stated, "Remember that deal
we were going to work on Hart Street. The income was on the low
end," and GORVITS responded, "Where the job didn't jive."
MULLINGS said, "Yeah," and GORVITS responded, "Come on, man! You
been in this business long enough to know that you can't have a
bus driver buying 600K house." MULLINGS said, "Not if the bus

                            19

driver got an inheritance." GORVITS said, "If you could show 12 months bank statements we can go full doc but I doubt that this lady got something like that, does she?" MULLINGS said, "Well you never know, man," and GORVITS responded, "Okay if she does send me some bank statements, send me some stuff and I will submit it . . . she could be a clean up lady for all I care . . . it's got to be . . ." Later in that same conversation, GORVITS stated, "I learned a lot from ALEX LIPKIN, he's a good friend of mine, he's been a friend of mine for many years." (Call # 241)

e.    On June 9, 2006, at approximately 4:29 p.m., GORVITS received a call on TARGET CELLPHONE 1 from FRANSWA LIGON. During this call, while GORVITS and LIGON discussed several properties including 268 Boerum Street [a property in Brooklyn], GORVITS stated, "I got another appraiser that told me that if I wait until Monday he should be able to get me maybe higher numbers on it." (Call #552)

f.    On June 19, 2006, at approximately 2:48 p.m., GORVITS used TARGET CELLPHONE 1 to place a call to JOHN GELIN, a/k/a "Buddha." During this call, GORVITS said, ". . . Remember those properties I told you about in Manhattan Beach?" GELIN responded, "Yes." GORVITS stated, "Yo. . . there's like a nice spread on these two houses, they are right next to each other, almost about $500,000 spread [the difference between the sale price and the mortgage amount they will be able to borrow for the

20

purchase of these properties, based upon the comparative
assessments of the properties in the vicinity of these two
properties]." GELIN responded, "Then let's do it." GORVITS
said, "But this is what I need to do, I need to get together with
you guys so we can look at them, you know talk about and plan out
what we can build there after we cash out. . . can we meet there
at 6 o'clock today?" Later in the same conversation, GORVITS
said, "Anything back on. . . Hussein? [a person I believe to be a
straw buyer] I need that account number. [referring to the
financial information for this particular straw buyer].    GELIN
said, "What did you need on Hussein, just the account number,
right?"  GORVITS responded, "The account number and the bank."
GELIN said, "That's what I'm waiting on, you already have his
employment stuff, right?" GORVITS said, "Yes." Later in the
same conversation, GELIN said, "What's the address?" GORVITS
responded, ". . . The address is 1607 Oriental Boulevard. . .
bring Franswa." GELIN said, "Alright." GORVITS said, ". . . I
am going to be there with my partner, too [referring to FUAD
YAKUBOV]. . . as soon as you get something from Hussein. . . give
me a call or e-mail it to me, I want to get that file in there
already. . . he didn't change his mind or nothing did he?" GELIN
said, "Oh no, not at all." This meeting was observed by other
FBI agents and that surveillance is described below in paragraph
30(b).  (Call #1461)

21

g.    On June 27, 2006 at approximately 6:41 p.m.,
GORVITS received a call on TARGET CELLPHONE 1 from FUAD YAKUBOV.
During this call, YAKUBOV told GORVITS that he "does not have the
buyer's number," but that he would "stop by the guy's workplace .
. . tomorrow morning and get all the info."  GORVITS replied that
they would need "their [own] person, they can't use the one of
that Franswa [FRANSWA LIGON] and that other one ... for Corbin
Place."  YAKUBOV then assured GORVITS that he would find people
for that property, and that YAKUBOV had "spoken to somebody who
has two people with credit score of 720 and 740 and . . . has
another person but can't use him because another two [people] are
closing him."  GORVITS replies that he can find somebody else,
"but all of them are asking too much – around $30,000" [referring
to the amount that the straw buyers asked to be paid]. (Call#
2297)

h.    On July 7, 2006, at approximately 12:19 p.m.,
GORVITS received a call on TARGET CELLPHONE 1 from FRANSWA LIGON.
During this call, GORVITS and LIGON discussed the fact that "the
guy we have for 188 Butler Street" bought two cars and his
"Experian score went down by 30 basis points."  GORVITS explained
to LIGON that he "has to raise the guy's income by $1500. Most
banks will not let you submit 1003s with a certain income and
resubmit it with a higher income.  Luckily I know this guy [at
the bank] well enough where he'll pull some strings for me."

Later in the conversation, GORVITS and LIGON discussed using "Hammer [a person I believe to be a straw buyer] on one of those Manhattan Beach properties." GORVITS told LIGON that he "needs to know Hammer's employment." LIGON responded that "he's a subway conductor from the MTA, he does not have a second job." GORVITS then told LIGON to "talk to Buddha [GELIN] about that because we are doing a loan amount of a million dollars. Subway conductors don't make that kind of money." GORVITS then suggested to LIGON that "Hammer has a second job, such as a bouncer in the city on weekends." LIGON replied that he "understands." (Call # 3428)

        I. On July 18, 2006, at approximately 1:32 p.m., ALEX GORVITS received a call on TARGET CELLPHONE 1 from Vanessa LNU [a person I believe to be a mortgage bank employee]. During this call, GORVITS asked Vanessa, "How high can you go on a loan amount on a stated/stated deal? Can you go up to a million? I'm looking to get a million dollars stated/stated, 100%" [referring to a $1 million mortgage loan in which the lender relies upon the income and assets stated by the borrower in the loan application and does not require any supporting documentation]. Vanessa asked GORVITS, "Is the borrower 1099?" GORVITS replied the he was "not sure what the borrowers are." Vanessa instructed GORVITS, "All the borrowers have to have a job. Anything stated over 10,000 monthly income goes to quality control . . . I'm not

23

saying it can't be done, but they'll go to QC, verify employment. . . About the same for self-employed. You'll need CPA letter and 3 references. And don't use Alex Rozenzaft."  (Call # 4797)

### C. SURVEILLANCE OF TARGET SUBJECTS

25.  I and other FBI agents have conducted surveillance on the AGA Capital branches located at 20-54 86th Street, Brooklyn, New York and on Coney Island Avenue, Brooklyn, New York, on multiple occasions.  As of April 2006, the 86th Street location appears to have been closed.  As of approximately June 19, 2006, AGA Capital appears to have opened an additional branch located at 2713 Coney Island Avenue, Brooklyn, New York.

26.  I and other law enforcement agents have observed GORVITS and LIPKIN enter and leave AGA Capital's offices at 2729 and 2713 Coney Island Avenue on a regular basis.  In particular, on or about July 11, 2006, I observed GORVITS, LIPKIN and an individual who appeared to be MISHELEVICH separately enter and leave the AGA Capital branch at 2713 Coney Island Avenue.

27.  On or about June 19, 2006, at approximately 5:00 p.m., ALEX GORVITS, FRANSWA LIGON, JOHN GELIN, a/k/a "Buddha," FUAD YAKUBOV and other unidentified males were observed as they met at 1607 Oriental Boulevard in Brooklyn, New York.  This meeting lasted approximately one hour and it was video recorded.

### D. TARGET OFFENSE RELATED CALLS ON TARGET CELLPHONE 2

28.  IGOR MISHELEVICH has used TARGET CELLPHONE 2 to

24

engage in multiple conversations concerning his ongoing
participation in mortgage fraud related activities. The
following is a chronological presentation of portions of some of
those intercepted communications. The descriptions of the
conversations are based upon tape recordings of the conversations
and transcriptions made by FBI analysts and Russian language
translators. Where necessary and possible, I have drawn on my
general training and experience, as well as my involvement in
this investigation, to include interpretations of certain terms
and phrases in brackets, and to provide the content of certain of
the calls. Where necessary and possible, I have also included
information obtained from other sources.

29. On July 6, 2006, at approximately 9:11 p.m., ALEX
GORVITS received a call on TARGET CELLPHONE 1 from IGOR
MISHELEVICH on TARGET CELLPHONE 2. During this call, GORVITS
told MISHELEVICH that he "need[ed] a serious buyer . . . a buyer
who could at least show . . . like six months . . . with a
serious [credit] score over seven hundred" because GORVITS was
"gonna work on a big project." MISHELEVICH asked GORVITS "how
much money is involved," and GORVITS replied, "it depends on what
the land is appraised for." GORVITS stated that he was "not going
to make the buyer a partner," but he would "take care of him very
nice [sic.]" MISHELEVICH asked GORVITS "how much money [does] he
has [sic.] to have in the bank for the next six months?" and

25

GORVITS replied "maybe some thirty five thousand." MISHELEVICH
then stated "And that's it?" to which GORVITS replied, "well
maybe it would be better fifty thousand." MISHELEVICH then
stated "You call it a serious . . . I thought you were talking
about a couple hundred thousand." MISHELEVICH later told
GORVITS, "I can ask, there are few people arounds, so I can ask.
It's not gonna hurt. . . I have somebody in mind, but I am not
sure she has fifty." MISHELEVICH then asked "how long does the
buyer have to keep the house for," and GORVITS responded that
"the house has to bought out first, then build a new house, then
sell it, so a year and year and a half." GORVITS told
MISHELEVICH to "try to find people we don't know." MISHELEVICH
agreed "Okay, No problem." Later in the conversation,
MISHELEVICH told GORVITS, "you see I have a lot of deals coming
up too, you know? I don't wanna kill them, they have a very good
score, they have seven above, you know? [referring to the high
credit scores of his straw buyers] . . . So just give me a little
time to speak to them. Maybe they have [UI] guys too, you know
what I mean?" GORVITS responded "No problem. Just if they
could find me one, this one for the big project." Based upon my
training, experience and familiarity with this investigation, I
believe that in this call GORVITS asked MISHELEVICH to find
GORVITS a "straw buyer" with a high credit score and at least
$50,000 in bank deposits for a property that GORVITS intends to

26

purchase by obtaining a fraudulently obtained mortgage.
MISHELEVICH did not want to provide GORVITS with any of the
"straw buyers" that MISHELEVICH is currently using to
fraudulently obtain mortgage loans on other properties, but
stated that he would try to find someone else for GORVITS.    (Call
# 3374)

30.    On July 14, 2006, at approximately 6:52 p.m., ALEX
GORVITS made a call on TARGET CELLPHONE 1 to IGOR MISHELEVICH on
TARGET CELLPHONE 2.    During this call, MISHELEVICH told GORVITS,
"the investors I work with, most of them don't give a fuck how
much they pay either thousand dollars or fifteen hundred dollars,
it's not coming out of my pocket, you know what I mean?"    GORVITS
asked, "You can only charge four, five points, and they take it
off the points?"    MISHELEVICH responded, "Not with me they don't
take it off . . . they charge extra, that's on top of the point,
you know what I mean?" GORVITS then asked "What do you put on the
HUD?" [referring to the HUD-1 form that is filled out at the
closing of a real estate transaction].    MISHELEVICH responded "it
just says on the HUD, just like you get processing an application
fee . . . How much is [it] that your office charges, thousand
dollars, right? . . . it's just, instead of that, you charge 15
hundred dollars and then just split it up.    It doesn't come out
of your points, kid."    Based upon my training, experience and
familiarity with this investigation, I believe that in this

27

conversation MISHELEVICH explained to GORVITS how to fraudulently record on the HUD-1 form various disbursements made to the TARGET SUBJECTS at real estate closings involving fraudulently obtained mortgages.    Later in the conversation, GORVITS stated, "back in the day in Northside [another name for AGA Capital] . . . when you and I were . . . rocking and rolling and shit . . . back then Alex [possibly ALEKSANDR LIPKIN] was fucking cashing 30 to 40 thousand dollar checks on one or two closings.  Then he was happy. . . . I guess back then he wasn't making the kind of money he is making now."  Based upon my training, experience and familiarity with this investigation, I believe that in this portion of the conversation, GORVITS and MISHELEVICH are discussing the illicit profits that they, ALEKSANDR LIPKIN and other TARGET SUBJECTS earned in the past from fraudulently obtained mortgages and that LIPKIN is currently engaging in fradulent schemes involving much larger sums of money.  (Call # 4343).

### TARGET CELLPHONE 2 TOLL ANALYSIS

31.  I have reviewed pen register telephone toll records for the TARGET CELLPHONE 2 for the period from July 22, 2006 through August 10, 2006 (the "Target Period").  These records reflect that during the Target Period, TARGET CELLPHONE 2 made or received a total of 696 calls to or from approximately 88 different telephone numbers.

28

32.    Telephone records reflect that during the Target Period, the TARGET CELLPHONE made or received 29 calls to or from a cellular telephone assigned call number (347) 247-2899, which is subscribed to ALEX LIPKIN, with the most recent call on July 27, 2006.

33.    Telephone records reflect that during the Target Period, the TARGET CELLPHONE made 7 calls to a cellular telephone assigned call number (347) 524-0798, which is subscribed to FRANSWA LIGON, with the most recent call on August 8, 2006.

34.    Telephone records reflect that during the Target Period, the TARGET CELLPHONE made or received 21 calls to or from a telephone assigned call number (212) 920-0707, which is subscribed to FUAD YAKUBOV, with the most recent call on August 9, 2006.

35.    Telephone records reflect that during the Target Period, TARGET CELLPHONE 2 made 1 call to a telephone assigned call number (718) 382-9004, which is subscribed to Alex Rozenzaft, with the most recent call on July 27, 2006.

## II.    ALTERNATIVE INVESTIGATIVE TECHNIQUES HAVE BEEN TRIED AND FAILED OR APPEAR UNLIKELY TO SUCCEED THUS THERE IS A NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS

36.    As discussed above, the purpose of this investigation is to identify, locate, and develop evidence against the TARGET SUBJECTS, and to identify the means by which those persons are committing the TARGET OFFENSES.    Interception

29

of wire communications occurring over TARGET CELLPHONE 2 is necessary to reveal the nature and scope of the TARGET SUBJECTS' mortgage fraud activities, the source of financing for the organization, and the location and disposition of the proceeds from those activities. Though the interception of wire communications occurring over TARGET CELLPHONE 1 we have been able to identify numerous new target subjects and, it is anticipated, that additional new targets will be identified through the interception of communications occurring over TARGET CELLPHONE 2. It is only through the combination of wire surveillance, visual surveillance and other investigatory tools that I and other agents expect to identify fully the nature and scope of the organization. As indicated below, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives:

          a.    Use of undercover officers will not be effective in achieving the complete goals of the investigation. By debriefing cooperating witnesses, we have been able to identify a number of the TARGET SUBJECTS. However, the TARGET SUBJECTS appear to be a discrete, tightly-knit group, which would not be susceptible to penetration by outsiders not previously known to the conspiracy. Although CW-1 might be able to introduce an undercover officer as a potential "straw buyer," the

undercover officer would not be able to withdraw from the real estate transaction prior to its closing without raising the suspicion of the TARGET SUBJECTS.  If an undercover agent were to participate in the closing of a fraudulent real estate transaction, law enforcement authorities would be left in possession of the property and/or have to reimburse the victim lender for the substantial loss it would suffer after foreclosure.  In any event, even if an undercover officer participated in a fraudulent real estate transaction with the TARGET SUBJECTS, he would not be able to learn the identities of all of the individuals involved, the financing or the organization, or the disposition of proceeds.  As a result, the use of undercover officers at this time is not available as an alternative technique to wire surveillance of the TARGET CELLPHONE.

b.   Similarly, the use of a confidential informant (a "CI") is unlikely to work.  As stated above, the tightly-knit nature of this conspiracy makes it unlikely that an informant without prior acquaintance with the TARGET SUBJECTS could gain entry to the conspiracy.  In addition, there is a strong likelihood that the conspirators would find a "cold" approach from an unknown CI to be highly suspicious, and alter their behavior in a manner that would make the instant investigation far more difficult.  Consequently, use of CIs is

31

not available as an alternative technique to wire surveillance of the TARGET CELLPHONE.

        c.    The FBI has gained valuable information concerning the TARGET SUBJECTS' mortgage fraud activities by debriefing a cooperating witness, CW-1.  However, this cooperating witnesses has no knowledge of IGOR MISHELEVICH's activities, can provide insight only into MISHELEVICH's co-conspirator's historical activities and not into present mortgage fraud activities.

        d.    The FBI has conducted physical surveillance of AGA Capital's three offices, however, the TARGET SUBJECTS conduct their real estate transactions inside private offices and buildings.  As a result, this method of investigation has met with little success and has not led to our discovery of further information concerning the TARGET SUBJECT's mortgage fraud activities.  Physical surveillance in and of itself, however, is useful mainly in generating information concerning the identity of an individual, where he or she resides, locations he or she frequents, and the identities of the persons with whom he or she meets.  FBI surveillance has, for instance, identified AGA Capital as a business address frequented by GORVITS and LIPKIN and MISHELEVICH.  The surveillance provides limited direct evidence of the significance of what occurs at such locations or meetings, however.  Thus, without wire surveillance to assist

agents in understanding the purpose of various meetings and
facilitating discrete surveillance, physical surveillance is
expected to be of limited utility.  In addition, with the
knowledge provided beforehand by wire surveillance that a meeting
is to take place at a given location, it may be possible to
establish physical surveillance at that location in advance, thus
minimizing the risks of discovery inherent in following subjects
or remaining at target locations for long periods of time.  This
was in fact the case for the above described June 19, 2006
surveillance.  We only learned about that meeting from a
conversation that was intercepted earlier that day on TARGET
CELLPHONE 1. (see call #1461 described in paragraph 14 (f)
above.)  Without the wire surveillance we would not have known
about that meeting in which several of our TARGET SUBJECTS met to
look at some additional properties in Brooklyn that we believe
they intend to purchase fraudulently.

        e.    Telephone toll records and pen registers
will provide only limited information.  This information alone
will not enable law enforcement officers to identify with
certainty the persons involved in the mortgage fraud enterprise,
or the contents of their telephone conversations.  The
interception of wire communications, however, will enable law
enforcement officers to identify target subjects and the content
of their fraud-related communications.

   f. Use of a federal grand jury does not appear
to be a promising method of investigation.  All the TARGET
SUBJECTS and other witnesses identified by law enforcement are
themselves participants in the mortgage fraud activities under
investigation.  These individuals face prosecution themselves; it
is unlikely therefore that any of them would testify voluntarily.
Nor would it be desirable at this time to seek immunity for such
individuals and to compel their testimony.  Immunizing them could
thwart the public policy that they be held accountable for their
crimes.  The issuance of grand jury subpoenas likely would not
lead to the discovery of critical information and undoubtedly
would alert the TARGET SUBJECTS to the pendency of this
investigation.  For many of the same reasons, the use of witness
interviews does not appear to be a promising method of
investigation.  Again, witnesses who could provide additional
relevant evidence have not been identified or would themselves be
participants in the mortgage fraud activities under
investigation.  Grand Jury subpoenas have been issued to banks
and lending institutions in an effort to identify other
individuals and bank accounts that might be involved in the
TARGET SUBJECTS's mortgage fraud activities, and while
interception of communications over TARGET CELLPHONE 1 has helped
us to identify additional properties that we believe will be the
subject of purchase using fraudulent mortgage applications, the
records for these purchases and any accounts used in these

purchases have not yet been identified, obtained or fully analyzed.

g.    Although the previous wire interceptions in this case have provided the FBI with important information, and provided substantial evidence against some of the TARGET SUBJECTS, the interception of TARGET CELLPHONE 1 ended without providing significant information about the activities of IGOR MISHELEVICH and the identities of other co-conspirators who are directly involved with MISHELEVICH in committing the TARGET OFFENSES, such as real estate processors, appraisers, accountants and other participants in MISHELEVICH's fraudulent mortgage transactions.    As shown above, TARGET CELLPHONE 2 is in frequent contact with other telephone numbers that based on the now concluded wiretaps are believed to also be involved with MISHELEVICH in mortgage fraud related activities.    Based upon my training, experience and familiarity with this investigation, including the conversations intercepted over TARGET CELLPPHONE 1, information contained in public documents, and pen register information, I believe that MISHELEVICH occupies a higher role in the enterprise than GORVITS in that he appears to be involved in fraudulently obtaining larger mortgages than GORVITS and has indicated that he works with certain unidentified "investors." Moreover, MISHELEVICH, unlike GORVITS, currently does not appear to work at AGA Capital with ALEKSANDR LIPKIN, and, therefore, frequently communicates with LIPKIN using TARGET CELLPHONE 2.

35

h.    Neither applications for search warrants, nor trash pulls, are appropriate at this stage of the investigation, as the locations where the TARGET SUBJECTS currently file, store, or hide documents related to their fraudulent real estate transactions and the proceeds of those transactions have not been identified.  Moreover, investigative methods used to date do not by themselves seem likely to yield this information.  Wire surveillance will assist law enforcement in identifying such locations, so that search warrants for such locations may be obtained at a later time.  Furthermore, applications for search warrants would appear to be premature at this stage of the investigation because, even though we have been able to identify, through confidential source information and surveillance, at least two locations where the TARGET SUBJECTS conduct their illegal mortgage fraud business -- AGA Capital, currently located 2713 and 2729 Coney Island Avenue, Brooklyn, New York --a search of that location at this time would be premature in that: (1) the FBI does not know what evidence, if any, would actually be present in that location; (2) any search of such a location at this point would not likely reveal the full extent of the TARGET SUBJECTS' criminal activity, (3) a search at this point would not likely enable law enforcement officers to identify with certainty all of the persons involved in the TARGET SUBJECTS' criminal enterprise; and (4) a search at this time would alert the TARGET

36

SUBJECTS to the existence of the otherwise covert criminal

investigation.  As to a search of other locations, it is not

known with certainty where the TARGET SUBJECTS conduct other

meetings and direct their other mortgage fraud activities.  In

particular, based upon surveillance to date, it does not appear

that MISHELEVICH works at either of AGA Capital's two Coney

Island Avenue offices with GORVITS and LIPKIN.  Wire surveillance

on TARGET CELLPHONE 2 will assist law enforcement in identifying

the locations where MISHELEVICH currently files, stores, or hides

documents related to his fraudulent real estate transactions and

the proceeds of those transactions.

### MINIMIZATION

37.    All monitoring of wire communications over

TARGET CELLPHONE 2 will be minimized in accordance with Chapter

119 of Title 18, United States Code.

38.    The "investigative or law enforcement officers of

the United States" and translators, if necessary, who are to

carry out the requested interception of wire communications, will

be instructed concerning the steps they should take to avoid

infringing upon any attorney-client privilege or other recognized

privileges.  However, to the extent that communications are

intercepted among the TARGET SUBJECTS and/or INTERCEPTEES that

concern real estate or mortgage transactions that are reasonably

believed to be in furtherance of the ongoing scheme to defraud

37

described above, those communications will be monitored pursuant
to the crime/fraud exception to attorney-client privilege.  See,
e.g., United States v. Ballard, 779 F.2d 287, 292 (5th Cir. 1986)
(attorney need not be aware of the client's fraudulent or
criminal intent); In re Grand Jury Subpoena Duces Tecum Dated
September 15, 1983, 731 F.2d 1032, 1039 (2d Cir. 1984)
(articulating standard as requiring "that a prudent person have a
reasonable basis to suspect the perpetration of a crime or fraud,
and that the communications were made in furtherance thereof").
Nevertheless, all communications intercepted will be conducted in
such a way as to minimize the interception of communications not
otherwise criminal in nature or subject to interception under
Chapter 119, Title 18, United States Code.  All monitoring will
cease when it is determined that the monitored conversation is
not criminal in nature.  Interception will be suspended
immediately when it is determined through voice identification,
physical surveillance, or otherwise, that neither the TARGET
SUBJECTS, the INTERCEPTEES nor any of their confederates, when
identified, are participants in the conversation, unless it is
determined during the portion of the conversation already
overheard that the conversation is criminal in nature.  If an
interception is minimized, monitoring agents shall spot check to
insure that the conversation has not turned to criminal matters.

        39.  It is requested that the order provide that, if
necessary, translators be authorized to assist in conducting this

38

wire surveillance and to receive disclosure of intercepted communications. Certain subjects of this investigation are expected to communicate with each other in the Russian language. It is therefore necessary to secure the services of translators in order to assist the agents in monitoring the wire surveillance and translating the intercepted communications. All such translators will be under contract to the FBI and will be directly supervised by the FBI, ICE and deputized law enforcement officers of NYPD. It is further requested, pursuant to Section 2518(5), Title 18, United States Code, that in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

### AUTHORIZATION REQUEST

40.    Based on the foregoing, it is my opinion that the interception of wire communications occurring over TARGET CELLPHONE 2, as specified above, is essential to uncover the full scope of the TARGET SUBJECTS' mortgage fraud activities.

41.    In as much as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not terminate when the sought wire communications are first obtained, but continue until

interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier. The 30-day period shall be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days from the date of this Court's Order.

42. It is further requested that, pursuant to Title 18, United States Code, Sections 2703, 3122 1nd 3123, Verizon Wireless be ordered to provide originating and terminating cell site information for the intercepted wire communications occurring over TARGET CELLPHONE 2, by permitting the FBI's SMART System to access such information. Such information will assist the FBI in locating the TARGET SUBJECTS, and is therefore relevant and material to its investigation.

43. Pursuant to the provisions of Title 18, United States Code, Sections 2518(4), it is requested that it be ordered that Verizon Wireless, the service provider for TARGET CELLPHONE 2, and any other service provider for TARGET CELLPHONE 2, furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all dial digits for both incoming and outgoing calls), pen register information, and audio interception capability), and access to TARGET CELLPHONE 2 voicemail box(es) or voicemail features to

40

contemporaneously intercept messages left on or retrieved from TARGET CELLPHONE 2 voicemail box(es) or voicemail systems.  The assistance of Verizon Wireless is required to accomplish the objectives of the requested interceptions.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the FBI.

44.   It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

_____
MICHAEL SEIFER
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Sworn to before me this
18 day of August, 2006

_____
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK