UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

M - 07 - 0003

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :
                                 :
          - v. -                 :
                                 :      **SEALED AFFIDAVIT FOR**
THE PREMISES KNOWN AND DESCRIBED :      **SEARCH WARRANTS**
AS THE LAW OFFICE OF ALEX        :
ROZENZAFT, 293 AVENUE S,         :      (Title 18, United States
BROOKLYN, NEW YORK ("PREMISES    :      Code, Sections 1343,
1"); AGA CAPITAL, 2729 CONEY     :      1344, and 1349)
ISLAND AVENUE, 1ST FLOOR,        :
BROOKLYN, NEW YORK ("PREMISES    :
2"); AGA CAPITAL, 2713 CONEY     :
ISLAND AVENUE, 3RD FLOOR,        :
BROOKLYN, NEW YORK ("PREMISES    :
3"); AND RIGONDA FINANCIAL, 1719 :
EAST 12TH STREET, 3RD FLOOR,     :
BROOKLYN, NEW YORK ("PREMISES 4") :
- - - - - - - - - - - - - - - - x

STATE OF NEW YORK        )
COUNTY OF KINGS          : ss.:
EASTERN DISTRICT OF NEW YORK )

          J. KEVIN O'DONNELL, Special Agent, Federal Bureau of

Investigation, being duly sworn, deposes and says:

          1.    I am a Special Agent with the Federal Bureau of

Investigation ("FBI").  I have been a Special Agent with the FBI

for approximately 11 years.  I have participated in several

investigations of Eurasian organized crime and, among other

things, have conducted or participated in surveillance, the

execution of search warrants, debriefings of informants and

reviews of taped conversations and business records.  I have

participated in the execution of approximately ten search

warrants.

          2.    I respectfully submit this affidavit in support of

an application for a warrant to search the premises known and
described as: (a) the Law Office of Alex Rozenzaft, located at
293 Avenue S, Brooklyn, New York ("PREMISES 1"); (b) AGA Capital,
2729 Coney Island Avenue, 1st Floor, Brooklyn, New York
("PREMISES 2"); (c) AGA Capital, 2713 Coney Island Avenue, 3rd
Floor, Brooklyn, New York ("PREMISES 3"); and (d) Rigonda
Financial, 1719 East 12th Street, 3rd Floor, Brooklyn, New York
("PREMISES 4") (collectively, "the PREMISES").  Based on the
facts set forth in this affidavit, there is probable cause to
believe that there is presently located at the PREMISES evidence
and instrumentalities of violations of federal law, including
violations of Title 18, United States Code, Sections 1343, 1344
and 1349.  Such evidence consists of the items set forth in
Attachments A and B to the Search Warrant.

     3.    The facts in this affidavit are based upon my
personal knowledge, as well as conversations I have had with
other law enforcement officers, witnesses, and other individuals
involved in this investigation and my review of documents,
recordings and other evidence.  Since this affidavit is made for
the limited purpose of obtaining search warrants, I have not set
forth each and every fact learned during the course of this
investigation.  Rather, I have set forth only those facts that I
believe are necessary to establish probable cause for the search
warrants sought herein.  Unless otherwise indicated, where

2

actions, conversations and statements of others are related
herein, they are related in substance and in part.

### THE SCHEME TO DEFRAUD

4.    In or about May 2006, other federal agents and I
began an investigation of mortgage fraud being committed by
several mortgage brokers and their associates in the Southern
District of New York and elsewhere.  Our investigation involved
the use of, among other things, cooperating witnesses, physical
surveillance, the review of records provided by banks and other
lending institutions, and judicially authorized wiretaps of three
different telephones used by the co-conspirators.  In the course
of the investigation, other agents and I identified over 20 of
the principal participants of the conspiracy, methods used to
conduct the mortgage fraud scheme, and locations used by the
members of the conspiracy to conduct their illegal scheme.
Specifically, I learned the following:

a.    From in or about 2004 through in or about
December 2006, Aleksander Lipkin, Igor Mishelevich, Alex Gorvits,
Igor Buzakher, Marina Dubin, Lucianne Morello, and Faina
Petrovskaya among others, conspired together to defraud various
banks and lending institutions ("the lenders") by submitting
applications and supporting documentation for mortgages and home
equity loans with materially false or misleading information, in
order to induce those lenders to make loans to persons and at

3

terms that the lenders otherwise would not have funded.  The co-conspirators and their associates brokered over one thousand home mortgages and home equity loans with the lenders, with a total face value of at least two hundred million dollars.

       b.    Lipkin, Mishelevich, Gorvits and Buzakher, among others, acted as mortgage brokers.  They operated their illegal scheme out of different mortgage brokerage firms in Brooklyn, New York, including AGA Capital NY, Inc. ("AGA Capital"), which operates out of two office buildings on the same block of Coney Island Avenue, Brooklyn, New York, namely, 2729 Coney Island Avenue, 1st Floor, Brooklyn, New York ("PREMISES 2"), and 2713 Coney Island Avenue, 3rd Floor, Brooklyn, New York ("PREMISES 3")[1]; and Rigonda Financial, located at 1719 East 12th Street, 3rd Floor, Brooklyn, New York ("PREMISES 4").  The mortgage brokers supervised and coordinated the submission of fraudulent loan applications and other documents to the lenders, and brokered the resulting loans.

       c.    The mortgage brokers were assisted by other co-conspirators, among them Franswa Ligon, who identified properties for sale in New York City and New Jersey, among other places (the "target properties").  The co-conspirators typically

---

[1]    In or about late 2006, AGA Capital changed its name to Lending Universe Corporation ("Lending Universe").  Gorvits, Mishelevich and Buzakher had previously worked at another brokerage firm, Northside Capital NY, Inc. d/b/a Northside Capital Corporation ("Northside Capital").

purchased the target properties with one or more mortgages and/or home equity loans amounting to 100 percent of the purchase price of the property, thus ensuring that they did not have any money at risk in the fraudulent transactions.

       d.   As part of the scheme, the co-conspirators sought to obtain mortgages and/or home equity loans to purchase the target properties without having to identify their ownership interest in the properties.  To that end, they recruited individuals to act as purchasers of the target properties.  These purchasers, or "straw buyers," relinquished their interest in and control over the target properties to the co-conspirators upon completion of the closing of the mortgage or loan.

       e.   Once a potential straw buyer had agreed to participate in the scheme, the co-conspirators, operating out of PREMISES 2, PREMISES 3, and PREMISES 4, submitted loan applications to the lenders on behalf of the straw buyers.  The co-conspirators fraudulently improved the straw buyer's credit worthiness by falsifying certain personal and financial information about the straw buyer in documents that were submitted to the lenders.  In support of these false and misleading representations, the co-conspirators also created false documentation, such as bank statements and proof of income, that the lenders relied upon to verify the statements in the loan applications.

f.    The co-conspirators sought mortgages and home equity loans for the target properties at values that were in excess of the properties' actual sale prices and, thus, the properties' true market values.  To support applications for loans in excess of the properties' market values, the co-conspirators procured artificially inflated appraisals of the market value of the target properties.  Using these false and misleading appraisals, the co-conspirators applied for, and received, mortgages and other loans in excess of the actual sale price of the properties securing the loans.  The difference between the appraised value of the property and the property's actual sale price was known as the "spread," and represented, in part, the co-conspirators' profits from the scheme.

g.    Once a lender had approved a mortgage or loan application for one of the target properties, the co-conspirators managed the closing, or settlement, of the mortgage or loan. Dozens of the fraudulently obtained mortgages and loans were closed at the direction of co-conspirator Marina Dubin, who acted as the settlement agent for these deals.  Operating out of PREMISES 1, Dubin managed all aspects of the closing process, including disbursing funds fraudulently obtained from the lenders to various of the co-conspirators.  These monies, which included the spread from a fraudulently-obtained mortgage loan, as well as commission fees of at least 2 percent, and as much as 4 percent,

6

on the fraudulently inflated loan values, represented the co-conspirator's personal gain from the scheme.

5.    On or about December 21, 2006, a federal grand jury returned Indictment 06 Cr. 1179 charging Aleksander Lipkin, a/k/a "Alex," a/k/a "Shorty," a/k/a "Melekiy," Igor Mishelevich, a/k/a "Ryzhiy," Alex Gorvits, a/k/a "Lyosha," Marina Dubin, Igor Buzakher, a/k/a "Jeff," Joseph Paperny, Daniel Mikhlin, a/k/a "Danik," John Gelin, a/k/a "Buddha," Franswa Ligon, Fuad Yakubov, Ricardo Acosta, Eric Callahan, Douglas Ellison, Oleg Anokhin, David Neustein, Tomer Sinai, a/k/a "Tom," Nathaniel Kessman, Carl Carr, John Ciafolo, Lucianne Morello, Faina Petrovskaya, Mariya Badyuk, a/k/a "Masha," and Marina Klotsman with participating in the mortgage fraud scheme described above, in violation of Title 18, United States Code, Sections 1343, 1344, and 1349.

## PROBABLE CAUSE TO BELIEVE THE PREMISES
## CONTAIN EVIDENCE OF THE MORTGAGE FRAUD SCHEME

### PREMISES 1

6.    The building located at 293 Avenue S, Brooklyn, New York ("PREMISES 1"), is a three-story building with a sign that says "Law Office" hanging above one of four windows on the first floor. According to public records, there is one Con Edison subscriber for the three-story property at PREMISES 1 whose contact number is (718) 382-9004. This telephone number is subscribed to Alex Rozenzaft, 293 Avenue S, First Floor, Brooklyn, New York ("the PREMISES 1 Phone").

7.    A cooperating witness ("CW-3")[2] has been inside PREMISES 1 and has described it to me. According to CW-3, the right entrance door leads to office space occupied by Marina Dubin. At the entrance, there is a desk used by a secretary, with a computer, as well as filing cabinets. Beyond the secretary's desk is the main office space used by Dubin, which contains a computer and filing cabinets. There is a door that leads from Dubin's office to the basement of the building, where, according to CW-3, there is another office, as well as at least two large filing cabinets.

8.    The left entrance door, on which there is a sign that reads "Professional Services, Inc.," leads to a stairwell that provides access to the second floor of the building. There is also a door that leads to the right side of the building, which is where Dubin's office is located. On the second floor, according to CW-3, there is a conference room, used by the co-conspirators to conduct real estate closings, with a computer and a copy machine. In addition, there are two other offices on the

---

[2]    CW-3 has pled guilty in federal court, pursuant to a cooperation agreement, to mortgage-fraud related charges. CW-3 has been sentenced in connection with those charges and has been released on bail pending the start of his term of imprisonment. While on release, CW-3 engaged in criminal activity with members of the conspiracy discussed above. CW-3 will be charged in connection with those activities and is providing information in hopes of receiving a reduced sentence on those future charges. The information provided by CW-3 in the past has in many instances been corroborated and has proven to be reliable.

second floor, at least one of which has a computer and a printer.

9. The third floor has two office areas. CW-3 informed me that one of the offices has a computer, printer and several filing cabinets. The other office contains two or three computers.

10. Based on physical surveillance and review of public records, I have learned that PREMISES 1 is ostensibly the law office of a lawyer named Alex Rozenzaft. However, during the course of this approximately seven-month investigation, Rozenzaft has not been surveilled at PREMISES 1 by any law enforcement agent, nor has he been intercepted on any of the wire intercepts conducted during that time. Rather, based on bank records that I have reviewed, information obtained from CW-3, wire intercepts and physical surveillance that I and others have conducted, I believe that Marina Dubin works at PREMISES 1, where she holds herself out as a real estate paralegal affiliated with Rozenzaft's practice. According to these sources of information, Dubin, operating out of PREMISES 1, served as the settlement agent for dozens of the loans that were fraudulently obtained by the co-conspirators.

11. According to information I have learned from various lenders affected by the co-conspirators' scheme, including BNC Mortgage, Inc. and Argent Mortgage Company, a settlement or closing agent is responsible for preparing certain

9

paperwork related to the transfer of title of a property, as well
as disbursing the buyer's or lender's funds related to the
purchase of a property. Among other things, the closing agent is
tasked with following the lender's instructions regarding the
disbursement of documents and monies to the appropriate parties.
Based on the investigation to date, I believe that Dubin, along
with other co-conspirators, prepared various documents containing
false or misleading statements at PREMISES 1, and then submitted
these documents to the lenders. I also believe that various
members of the conspiracy met at PREMISES 1 to conduct their
illegal business, including by holding closings for properties
obtained with by fraudulent means. Finally, I believe that
fraudulently obtained loan proceeds were disbursed by Dubin and
others to various of the co-conspirators at PREMISES 1.

12. Set forth below is information gathered from
physical surveillance and judicially authorized wire intercepts
of cellphones used by co-conspirators Alex Gorvits, Igor
Mishelevich and Alex Lipkin which reflect that the co-
conspirators conducted their illegal scheme, in part, at PREMISES
1. I have included summaries of selected intercepted telephone
calls, based on my review of the line sheets.[3] Where

---

[3]    Intercepted statements set forth in quotations are
taken directly from the linesheets, or summary transcriptions
and/or transalations, of the taped conversations. The linesheets
and summary transcriptions are the product of preliminary
transcriptions and translations of the calls and are subject to

10

appropriate, I have attempted to "decode" intercepted
conversations by setting forth my belief as to the actual meaning
of the coded terms, based upon my training and experience, my
participation in this investigation, my discussions with other
law enforcement officers, and the context of the conversations:

        a.   On or about August 22, 2006, at approximately
10:51 a.m., Mishelevich had a telephone conversation with Franswa
Ligon, a co-conspirator.  During the call, in substance and in
part, Mishelevich told Ligon that they would meet "at Marina's
office" at 2:00 p.m. that day.  Mishelevich asked Ligon when he
was expected to get any payoff.  Ligon said that "they say 5-7
business days but I was on their case so they said before the end
of this week."  Mishelevich asked Ligon if he still had the old
ones from December.  Mishelevich told Ligon to bring them.

        b.   On or about August 22, 2006, other agents and
I conducted surveillance at PREMISES 1.  Igor Mishelevich was
observed leaving PREMISES 1 at approximately 4:14 p.m. with an
unidentified female.  Several minutes later, at approximately
4:20 p.m., Franswa Ligon, another member of the conspiracy, was
observed leaving PREMISES 1 with an unidentified male and female.

        c.   On or about August 22, 2006, at approximately
4:34 p.m., Mishelevich received a telephone call from Dubin on
the PREMISES 1 Phone.  During the call, in substance and in part,

---

further revisions.

11

Dubin informed Mishelevich that she was going "to put 336 and 459 Pulaski on hold for two days." Dubin asked Mishelevich for the "real appraisal for 459 Pulaski, not what he gave her." Mishelevich said it was "the only appraisal that he got from 'him'" and that he did not have any other appraisal.

        d.    On or about September 5, 2006, at approximately 11:57 a.m., Mishelevich had a telephone conversation with Marina Dubin on the PREMISES 1 Phone. During the call, in substance and in part, Mishelevich told Dubin that she should have the documents by 1:00 p.m., and that he would be at the closing. Mishelevich specified that they had "640 loan amount times 4 points, it will be 25,600. And the points on the back will be done 80/20, right?" Dubin said yes. Mishelevich said that "it works out no points on the back, everything is up front. On the HUD it says 512 times 3 points equals 15,360. And on the side 10,240 goes to Anna. And add another thousand to that 15,000, because our processing application fees are like 1500." Dubin said, "so, $11,240." Mishelevich said, "$15,000 to Rigonda and $11,240 to Anna." I believe, based on my training, experience and my participation in this investigation, that, in this call, Mishelevich is instructing Dubin how to divide the proceeds from a fraudulently obtained loan.

        e.    On or about September 7, 2006, at approximately 12:51 p.m., Mishelevich had a telephone

conversation with Dubin, who was speaking on a telephone with
call number (718) 382-9005, which is also subscribed to Alex
Rozenzaft, 293 Avenue S, Brooklyn, New York, which is PREMISES 1.
During the call, in substance and in part, Dubin asked
Mishelevich where to fax the checks. Mishelevich said in the
office, and confirmed she would be faxing two checks.

    f. On or about October 4, 2006, at approximately
5:39 p.m., Mishelevich had a telephone conversation with Dubin,
who was speaking on the PREMISES 1 Phone. During the call, in
substance and in part, Dubin said she was having a problem with
BNC. Mishelevich said they had a slight mix up but would have
the documents ready by tomorrow morning. Mishelevich asked if
Dubin had faxed the documents to Faina [Petrovskaya, a co-
conspirator.] Dubin said she had. Mishelevich said they should
have closed this deal a month ago. Mishelevich noted that "first
the contract was in one name, then in another." Later, he said
that "nobody wanted to give him 100 percent." "Today,"
Mishelevich said, "everything had to be changed once again" in
Mishelevich's mother's name. I believe, based on my training,
experience and my participation in this investigation, that, in
this call, Mishelevich is explaining to Dubin that they
experienced delay in obtaining funding for a certain property
because of problems with the straw buyer, and that they had
changed straw buyers to close the deal.

g.    On or about November 10, 2006, at approximately 12:12 p.m., Alex Lipkin had a telephone conversation with Dubin.  During the call, in substance and in part, Lipkin said, "I need this contract done, you are going to represent both sides .... and bank."  Dubin said, "I am the buyer and the bank?"  Lipkin said, "You the buyer, the seller and the bank.  What else?  I have a closing on Monday and you, too, will be the bank."

h.    On or about November 13, 2006, at approximately 4:19 p.m., Lipkin had a telephone conversation with Dubin on the PREMISES 1 Phone.  During the call, in substance and in part, Dubin said she "needs to disburse and wants to know whom to disburse to."  Lipkin told her that they owe him $15,000 more, so she should write a check for $22,000.

i.    On or about November 15, 2006, at approximately 2:28 p.m., Lipkin had a telephone conversation with Dubin on the PREMISES 1 Phone.  During the call, in substance and in part, Dubin asked Lipkin if he had the HUD [U.S. Department of Housing and Urban Development form that sets out the settlement costs to the buyer and seller].  Dubin told him to look at the second page, because there are two origination fees.  Lipkin noted the fees, and suggested they replace it, "what difference does it make."  Dubin said she can't do that "because the bank will not let her do it that way."  Later in the conversation,

14

Dubin suggested that they change the HUD form by hand.

13.  On or about October 12, 2006, CW-3, acting at the direction of FBI agents, participated in a closing at PREMISES 1 for a fraudulently obtained mortgage.  CW-3 had served as the intermediary between Igor Mishelevich, who acted as the mortgage broker for the loan, and Marina Klotsman, who was the straw buyer, for a property located at 466 Milford Street, Brooklyn, New York, which had a purchase price of $400,000.  The purpose of the meeting at PREMISES 1 was to sign the closing documents.  The meeting was recorded by both audio and videotape.  I also participated in surveillance of PREMISES 1 on this date.  Based on my review of the audio and video tape, surveillance and conversation with CW-3, I learned that Marina Dubin acted as the settlement agent for this deal.  During the course of the closing, CW-3, along with co-conspirators Mishelevich and Klotsman, met in the conference room on the second floor of PREMISES 1 to sign the relevant documents.  Mishelevich retrieved several documents for Klotsman's signature from the first floor of PREMISES 1.  At a certain point, CW-3 and Mishelevich had a conversation regarding Klotsman's fee for acting as a straw buyer.  Mishelevich also informed CW-3 that he expected a particular fee for brokering the deal.  At the close of the meeting, the parties agreed to meet at PREMISES 1 at a later date for the disbursement of the monies related to the deal.

14.  On or about October 16, 2006, CW-3, acting at the direction of FBI agents, met Mishelevich and Klotsman again at PREMISES 1 for the purpose of receiving the funds associated with the closing for 466 Milford Street.  This meeting was recorded by audio tape.  In addition, other agents and I conducted surveillance outside PREMISES 1.  Based on my review of the audio tape, surveillance and conversation with CW-3, I learned that, at approximately 2:50 p.m., CW-3 met with Mishelevich outside PREMISES 1 to discuss the split of proceeds from the purchase price of the property.  Mishelevich informed CW-3 that Klotsman wanted $40,000 for serving as a straw buyer.

15.  At a certain point, CW-3 and Mishelevich entered PREMISES 1.  Thereafter, inside PREMISES 1, on the first floor, the loan proceeds were distributed.  Among other checks that were distributed, CW-3 received a check for $10,000 for his role in the scheme, and Mishelevich received a check for $10,000 for brokering the deal.  The checks were cut from an account bearing Alex Rozenzaft's name, and a signature stamp was used to sign Rozenzaft's name.

16.  At a certain point, Mishelevich left PREMISES 1 with a person now known to me as the co-conspirator Nathaniel Kessman, an account executive with First Franklin, a mortgage lender.  Based on my training, experience and my participation in this investigation, I do not believe there is a legitimate reason

16

for Kessman to be at PREMISES 1 with the closing agent, the
mortgage broker and the other parties to a real estate
transaction.

17.   In the course of the investigation, I have
reviewed records provided by the lenders regarding loans obtained
by AGA Capital, Northside Capital and Lending Universe.
Specifically, I have reviewed documents provided by National City
Corporation ("National City"), which indicate that National City
identified approximately 100 loans with either the same brokerage
(AGA Capital or Northside Capital), the same broker (Alex Lipkin
or Igor Lipkin) or the same settlement agent (Alex Rozenzaft)
that had indicia of fraud.  As explained above, I believe that
Marina Dubin held herself out as acting on Alex Rozenzaft's
behalf for the purpose of executing real estate closings at
PREMISES 1.

18.   I have also reviewed documents provided by Argent
Mortgage which reflect that "Marina," or Alex Rozenzaft, served
as the closing agent for approximately 140 properties brokered by
Northside Capital and AGA Capital/Lending Universe.

### PREMISES 2 and 3

19.   As previously stated, AGA Capital operates out of
two office buildings located on the same block of Coney Island
Avenue, namely 2729 Coney Island Avenue, First Floor, Brooklyn,
New York ("PREMISES 2") and 2713 Coney Island Avenue, 3rd Floor,

17

Brooklyn, New York ("PREMISES 3").

        20.    PREMISES 2 is a one-story commercial property.
The entrance is on the right-hand side of the building.  The
front of the PREMISES is a glass facade that faces Coney Island
Avenue.  On the front of the facade, there is a sign that reads
"AGA Capital," with the address "2729."  A confidential informant
("the CI")[4] has been inside PREMISES 2 and described it as
follows: through the main entrance, there is an interior lobby
with a door on the right and a door on the left.  A buzzer system
allows access through the right door into the main office area.
In this area, there is a receptionist in the front, and then two
rows of approximately six to eight desks in each row.  Beyond the
two rows of desks, several of which have computers, there are
three larger, enclosed offices at the rear of PREMISES 2.  The CI
observed that one of the large offices in the back contained
several smaller offices, each with a computer in it.

        21.    In or about June 2006, AGA Capital expanded from
PREMISES 2 to 2713 Coney Island Avenue, 3rd Floor, Brooklyn, New
York ("PREMISES 3").  I have been to PREMISES 3, and have
observed the following.  The building where PREMISES 3 is located
is a three-story commercial building, with a glass facade facing

---

        [4]    The CI is a paid informant for the FBI.  The CI has
provided information to the FBI in past investigations, which has
led to arrests and convictions.  In this investigation, the CI's
information has been corroborated in many respects.

Coney Island Avenue. The entrance door is on the left of the building, and on that door is a piece of paper with the number "2713" written on it.

22. I have been inside PREMISES 3, and have observed the following. Inside the entrance to 2713 Coney Island Avenue, there is a stairwell that leads to the second and third floors of the building. On the third floor, there is a wooden door on the right side of the stairwell that leads to an interior office. There is no marking on this door. Through the door, there is an office area. There is a desk near with entrance with a computer on it, which appears to be the reception area. In the main office, behind the reception area, there are at least two desks with computers, as well as several cabinets. To the right of the reception area, on the side of the office facing Coney Island Avenue, there is an office enclosed in glass with a desk and a computer. To the left of the reception area, there is a wall with a wooden door, which leads to a back office. There are two desks in the back office, with computers on both. There were various photographs located in the back office. Alex Lipkin was depicted in at least one of the photographs.

23. Based on physical surveillance, wire intercepts, and my review of bank and other records, among other things, I have learned that co-conspirators Alex Lipkin, Alex Gorvits, Lucianne Morello and others, are employed by AGA Capital (now

19

known as Lending Universe).  Lipkin and Gorvits, among others,
act as mortgage brokers at PREMISES 2 and 3, where they direct
the preparation and submission of fraudulent mortgage and loan
applications.  Co-conspirator Lucianne Morello assembles and
submits mortgage applications to various lenders on behalf of
Gorvits and Lipkin.  The applications are submitted in the names
of various straw buyers, and typically contain false and
misleading information regarding the straw buyer's credit
worthiness.  Set forth below is information gathered from
physical surveillance, wire intercepts, and cooperating
witnesses, which reflects that the co-conspirators conduct their
illegal business in part at PREMISES 2 and PREMISES 3:

a.    On or about May 15, 2006, law enforcement
officers conducted surveillance at PREMISES 2.  On that day, Alex
Gorvits was observed leaving PREMISES 2 at approximately 5:34
p.m.  He was then observed returning to PREMISES 2, at
approximately 6:52 p.m., and leaving again at 7:20 p.m.

b.    On or about May 16, 2006, law enforcement
officers conducted surveillance at PREMISES 2.  On that day, Alex
Lipkin was observed leaving PREMISES 2 at approximately 4:29
p.m., and having a conversation in front of the building where
PREMISES 2 is located.  Shortly thereafter, Lipkin was observed
entering PREMISES 2, and then leaving again, at approximately
5:54 p.m.  Also on that day, Gorvits was observed leaving

20

PREMISES 2 at approximately 7:21 p.m.

        c.   On or about July 11, 2006, law enforcement officers conducted surveillance at PREMISES 2 and PREMISES 3.  On that day, at approximately 3:00 p.m., Gorvits was observed leaving PREMISES 3.[5]  A few minutes later, Gorvits entered PREMISES 2.  Thereafter, Gorvits left PREMISES 2, and entered PREMISES 3 again.  At approximately 3:21 p.m., Alex Lipkin was observed leaving PREMISES 3.

        d.   On or about November 10, 2006, other law enforcement officers and I conducted surveillance at 2279 East 29th Street, Brooklyn, New York, believed to be Lipkin's residence ("the LIPKIN HOUSE").  At the outset of surveillance, at approximately 9:00 a.m., a Bentley, with New York license plate DSW 1419 ("the Bentley") was observed parked in the driveway of the LIPKIN HOUSE.  At approximately 10:05 a.m., Alex Lipkin was observed leaving the LIPKIN HOUSE and entering the Bentley.  At approximately 10:15 a.m., Lipkin was observed parking the Bentley in the parking area of a building adjacent to PREMISES 3.  A short while later, Lipkin was observed getting into another vehicle ("the Vehicle") with a person I have identified as an employee of AGA Capital ("the Employee").  At approximately 10:30 a.m., co-conspirator Alex Gorvits approached

---

[5] When I refer to leaving and entering PREMISES 3, I mean leaving and entering the building where PREMISES 3 is located.

the Vehicle and appeared to speak with Lipkin.  Thereafter,
Lipkin got out of the Vehicle, and he and Gorvits entered
PREMISES 3.  The Employee got out of the Vehicle and entered
PREMISES 2.  At approximately 12:02 p.m., Lipkin came out of
PREMISES 3 and spoke with several unidentified men.  At
approximately 12:05 p.m., Alex Lipkin had a telephone
conversation with Lucianne Morello, in which Lipkin asked
Lucianne Morello to make a copy of a document and have an AGA
employee bring it to him downstairs.  At approximately 12:07
p.m., an AGA employee was observed coming out of PREMISES 3, and
handing Lipkin what appeared to be a document.  The employee then
returned to PREMISES 3.

        e.  On or about December 27, 2006, the CI entered
PREMISES 2 and spoke with an employee, who stated that he worked
for Lending Universe.  As described above, in or about late 2006,
AGA Capital changed its name to Lending Universe.

        f.  On or about December 29, 2006, I spoke with
the receptionist at PREMISES 3, who informed me that the business
was run by Alex Lipkin, and that it was affiliated with Lending
Universe, which is located at 2729 Coney Island Avenue (which is
PREMISES 2).  I also learned that PREMISES 3 has approximately
four to five employees.

      24.  In the course of the investigation, I have also
reviewed records provided by various lenders which relate to

mortgages and/or loans that were brokered by employees of AGA
Capital/Lending Universe.  As described above, mortgage brokers
with AGA Capital obtained mortgages under false pretenses, and
with false and misleading information.  Each of the documents
described below relates to a mortgage that was obtained through
the submission of false or misleading information:

      a.   In or about September 2005, First Franklin
funded a loan for $1,200,000 for the purchase of 221 Washington
Avenue, Brooklyn, New York.  Subsequent investigation has
revealed that a straw buyer was used to purchase this property,
and that certain information on the Uniform Residential Loan
Application ("Form 1003"), which contains information about the
prospective buyer, was false.  Igor Buzhaker, a/k/a "Jeff,"
another indicted co-conspirator, is listed as the interviewer on
the Form 1003, and provided PREMISES 2 as his address.

      b.   In or about October 2005, BNC Bank funded a
loan for $380,000 for the purchase of 330 Old Tacy, Kauneonga
Lake, New York.  Subsequent investigation has revealed that a
straw buyer was used to purchase this property, and that certain
information on the Form 1003 was false.  Alex Lipkin is listed as
the interviewer on the Form 1003, and provided PREMISES 2 as his
address.

      c.   In or about December 2005, Washington Mutual
Bank funded a loan for $882,500 for the purchase of 100 Oceana

Drive, Apt 3E, Brooklyn, New York.  Subsequent investigation has
revealed that a straw buyer was used to purchase this property,
and that certain information on the Form 1003 was false.  Alex
Lipkin is listed as the interviewer on the Form 1003, and
provided PREMISES 2 as his address.

### PREMISES 4

25.  As stated above, Rigonda Financial operates from a
three-story commercial property building located at 1719 E. 12th
Street, Brooklyn, New York.  There is a green awning over the
entrance to the building, with the numbers "1719" on the awning.
At the entrance, there is a glass door.  I have learned from
other law enforcement officers who have been inside 1719 E. 12th
Street that the front door leads to a small foyer, where there is
a staircase that leads to the second and third floor.  On the
third floor, which is PREMISES 4, there is only one door,
attached to which is a piece of paper with the name "Rigonda" on
it.[6]  Through the entrance door, there are approximately ten
desks organized in five rows of two desks each, each with
computers in the main office area.  Toward the back of PREMISES
4, there is a smaller, open room.  Toward the left, there is
another enclosed room with two desks with computers and file
cabinets.  Co-conspirator Faina Petrovskaya and another employee

---

[6]    This piece of paper was attached to the door on or
about December 1, 2006.

were observed in this room.

        26.  In the course of the investigation, a law
enforcement officer learned from an interview with an employee of
Rigonda Financial that Rigonda's lease is in the name of "Adym
Consulting."  The employee also stated that in January 2007,
Lending Universe would be assuming the lease of PREMISES 4.  As
explained above, AGA Capital changed its name to Lending Universe
at the end of 2006.

        27.  Based on physical surveillance, wire intercepts,
and my review of bank and other records, I have learned that co-
conspirators Igor Mishelevich, Daniel Mikhlin, and Faina
Petrovskaya, among others, operate the illegal mortgage fraud
scheme from PREMISES 4.  Mishelevich and Mikhlin, among others
act as mortgage brokers.  Faina Petrovskaya assists Mishelevich
and Mikhlin, among others, in the preparation and submission of
fraudulent mortgage applications.  Set forth below is information
gathered from physical surveillance and judicially authorized
wire intercepts of a cellphone used by co-conspirator Igor
Mishelevich, which reflects that the co-conspirators conducted
their illegal scheme, in part, at PREMISES 4:

        a.  On or about August 28, 2006, at approximately
11:46 a.m., Mishelevich had a telephone call with Faina
Petrovskaya, who was speaking on a telephone with call number
(718) 382-7585.  I have learned, based on public records, that

25

several telephone numbers, including (718) 382-7585 ("Phone 1"), (718) 382-8047 ("Phone 2") and (718) 382-7586 ("Phone 3") are subscribed to Adym Consulting, Ltd., 1719 E. 12th Street, Brooklyn, New York.[7]  During the call, Petrovskaya asked if they sent Argent [Mortgage Company] to Nikolai Kushner.  Mishelevich said no, he believes Argent is Inna Klotsman.  Petrovskaya said, "it's 1747 Dean Street.  It's Nikolai's address."  Mishelevich said, "Yes, to that address."  Petrovskaya responded, "Okay, right, because with BNC [another mortgage brokerage] we have a different address: 740 Evergreen Avenue."  Later in the discussion, Mishelevich asked whether the BNC files were cleared to close.  Petrovskaya replied, "BNC it was Klotsman cleared to close.  Both are Klotsman."  She explained, "One with Long Beach, one with BNC.  Both cleared to close."  Later in the discussion, Petrovskaya asked Mishelevich for the location of the Klotsman file, and Mishelevich told her to look on his desk.  I believe, based on my training, experience and my participation in this investigation, that, in this call, Mishelevich and Petrovskaya discussed the status of loan packages for two different straw buyers.

b.    On or about August 28, 2006, at approximately 12:39 p.m., Mishelevich had a telephone conversation with

---

[7]    As explained above, Rigonda Financial used the name "Adym Consulting" on its lease.

Petrovskaya on Phone 2.  During the call, Mishelevich asked

Petrovskaya to work on the documents, and said he would work on

the bank check.  Petrovskaya said she "has to email her an

explanation why they decided to buy it non-owner occupied."

Mishelevich told Petrovskaya to say that "she [the straw buyer]

was interested in buying another house and she wants this as an

investment property."  Mishelevich told Petrovskaya to type the

letter, and said he would sign it.  I believe, based on my

training, experience and my participation in this investigation,

that, in this call, Mishelevich explained to Petrovskaya how to

justify a change on a straw buyer's loan application regarding

the buyer's purported purpose in purchasing the property.

c.    On or about August 29, 2006, a law

enforcement officers conducted surveillance outside 1719 E. 12th

Street, Brooklyn, New York.  Law enforcement officers observed

Mishelevich and co-conspirator Oleg Anokhin conduct a meeting

outside the front door of 1719 E. 12th Street, the building where

PREMISES 4 is located.  At a certain point, Mishelevich entered

1719 E. 12th Street.  A few minutes later, the law enforcement

officer observed co-conspirator Alex Gorvits in the vicinity of

PREMISES 4.

d.    On or about September 7, 2006, at

approximately 12:42 p.m., Mishelevich had a telephone

conversation with Faina Petrovskaya on Phone 1.  During this

27

call, Petrovskaya and Mishelevich discussed an upcoming real estate closing. Petrovskaya told Mishelevich that she "just talked to Debbie from the title company . . . John should have gotten it, because the fax arrived." Mishelevich replied, "he's working on the conditions, he'll have them by tomorrow." Petrovskaya then stated, "so we can close it, on Nikolay Kushner [a straw buyer], he signed on both files. Can you please? . . . . Colleen [Colleen Kearns] isn't there . . . or don't call her, call Carl Carr . . . is Acosta closing?" Mishelevich responded "don't know, he is waiting for a call back from the bank." Petrovskaya then stated "I don't know what to do with Letellier [another straw buyer]" and Mishelevich replied, "for now, leave it alone, I'll resubmit it next week." Petrovskaya stated, "I was trying to give it to BNC, nobody wants to do it." Mishelevich responded "yeah, it's a big loan amount."

        e.    On or about September 28, 2006, at approximately 3:54 p.m., Mishelevich had a telephone conversation with Petrovskaya on Phone 3, regarding the submission of a deal to a lender. During the call, Petrovskaya said, "I'm sending the VOR [Verification of Rent]. I hope they don't give us a problem that it's the same last name. They're going to verify employment." Later in the conversation, Petrovskaya said, "And appraisal needs to come out from review fine." Mishelevich responded, "That's the same appraisal, just the name has been

changed. Last time it got approved." Later, Mishelevich directed Petrovskaya to find a particular file on his desk. I believe, based on my training, experience and my participation in this investigation, that, in this call, Mishelevich and Petrovskaya discussed recycling information about a straw buyer that had been previously submitted to a lender.

   f. On or about October 17, 2006, at approximately 3:20 p.m., Mishelevich had a telephone conversation with Petrovskaya on Phone 2. During this call, Petrovskaya said: "A question. I believe we've already spoken about this. Option One [a mortgage lender]. Do you remember they wrote prepayment penalty 12 months?" Mishelevich said, "Yeah, that's fine. That's okay." Petrovskaya replied, "Because I remember when there is no prepayment penalty you're not allowed to make anything in the back." Mishelevich responded, "No, prepayment is fine, because we're gonna keep it for 12 months anyway." I believe, based on my training, experience and my participation in this investigation, that, in this call, Mishelevich informed Petrovskaya that he was not concerned about being charged a penalty for selling the property within a short time frame because he intended to hold onto the property in question for 12 months, and then flip it.

   g. On or about December 1, 2006, law enforcement officers conducted surveillance at PREMISES 4. Law enforcement

officers observed a Federal Express package delivered to the
location with the address "Rigonda Financial, Attn: Andre."  In
addition, law enforcement officers observed co-conspirator Faina
Petrovskaya inside PREMISES 4.

28.  The investigation of the mortgage fraud scheme
continued through December 2006, including wiretap interceptions
of Alex Lipkin's cellphone, which revealed that the scheme was
ongoing.  Therefore, I believe, based on my training, experience,
and participation in this investigation, that evidence of the
illegal mortgage fraud scheme is still maintained at the
PREMISES.

### Special Procedures To Protect Privileged Materials From Disclosure

29.  PREMISES 1 appears to be a law firm, and the files
within the PREMISES 1 are purportedly used by a lawyer.  However,
as explained above, the lawyer, Alex Rozenzaft has been neither
surveilled entering or leaving PREMISES 1, nor has he been
intercepted, or even mentioned, on the wiretaps conducted in this
investigation.  Nonetheless, the following "ethical wall"
procedure will be followed regarding those documents seized from
the PREMISES 1, to ensure that the Assistant United States
Attorneys and law enforcement agents working on the case will not
review those seized materials until after the documents and files
have been screened for material as to which the attorney-client
privilege does not apply.  The procedures to be followed are as

follows:

      a.   At least one FBI agent who will no longer participate in the investigation will be present at PREMISES 1 during the search and/or will be consulted during the search concerning potential attorney-client issues, but no other member of the team of FBI agents who have investigated this matter will be present at PREMISES 1 during the search or will be consulted during the search concerning such potential privilege issues;

      b.   An Assistant United States Attorney who is not a member of the prosecution team (the "walled Assistant United States Attorney") will be available by telephone to answer questions from the seizing agents at PREMISES 1;

      c.   After the search is completed, the seized materials will first be reviewed by the walled Assistant United States Attorney who is not part of the prosecution team to determine whether any of the materials are materials as to which the attorney-client privilege does not apply or whether they arguably fall within an exception to the attorney-client privilege (e.g., the crime/fraud exception).

      d.   If the materials are determined not to be privileged, the seized materials will be turned over to the agents and Assistant United States Attorneys prosecuting the case;

      e.   If the materials are determined to be

31

privileged, the seized materials will not be shown to the agents and Assistant United States Attorneys prosecuting the case. Instead, in this case, the seized materials will be returned to a designated custodian of records for PREMISES 1 (with sealed copies retained by the walled Assistant United States Attorney);

f.    Any materials that are arguably privileged or in dispute will be retained by the walled Assistant United States Attorney and submitted to a United States Magistrate Judge or a United States District Court Judge for a ruling as to whether the privilege applies and/or whether the materials fall within any exception to the attorney-client privilege;

g.    The arguably privileged materials retained by the walled Assistant United States Attorney will not be shown to the agents and Assistant United States Attorneys prosecuting the case unless and until a Judge determines that the materials are not privileged or fall within any exception to the attorney-client privilege;

h.    Computer files will be removed intact if possible and will be examined for relevant files initially through word search techniques and other procedures listed below, and then the identified files will be reviewed to determine relevance and privileged status in accordance with the above-described procedure; and

i.    After an initial review of hard copies of the

client files seized from PREMISES 1, and no later than 21 days from the date of the seizure unless further application is made by the Government, the Government will make reasonable efforts to create a log of those client files that have not yet been turned over to the prosecution team, nor returned to the designated custodian of records for PREMISES 1, and to provide such log to the designated custodian of records for PREMISES 1.

### Procedures For Seizure of Computers and Computer Disks

30.    Based on my training and experience, and information provided to me by other law enforcement officers who have worked on investigations involving mortgage fraud, any computers or computer equipment at the PREMISES are likely to be one of the primary means of storing evidence of the crime, as well as used in the commission of the crime, including to transmit electronic communications and documents in furtherance of the crime, and therefore may be seized pursuant to Federal Rule of Criminal Procedure 41(b)(1) and (3).

31.    Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that searching computerized information for evidence or instrumentalities of a crime commonly

33

requires agents to seize most or all of a computer system's
input/output peripheral devices, related software documentation,
and data security devices (including passwords) so that a
qualified computer expert can accurately retrieve the system's
data in a laboratory or other controlled environment.  This is
true for the following reasons:

      a.   Searching computer systems is a highly
technical process which requires specific expertise and
specialized equipment.  There are so many types of computer
hardware and software in use today that it is impossible to bring
to the search site all of the necessary technical manuals and
specialized equipment necessary to conduct a thorough search.  In
addition, it may also be necessary to consult with computer
personnel who have specific expertise in the type of computer,
software application or operating system that is being searched.

      b.   Searching computer systems requires the use
of precise, scientific procedures which are designed to maintain
the integrity of the evidence and to recover "hidden," erased,
compressed, encrypted or password-protected data.  Computer
hardware and storage devices may contain "booby traps" that
destroy or alter data if certain procedures are not scrupulously
followed.  Since computer data is particularly vulnerable to
inadvertent or intentional modification or destruction, a
controlled environment, such as a law enforcement laboratory, is

34

essential to conducting a complete and accurate analysis of the
equipment and storage devices from which the data will be
extracted.

   c. The volume of data stored on many computer
systems and storage devices will typically be so large that it
will be highly impractical to search for data during the
execution of the physical search of the premises.  A single
megabyte of storage space is the equivalent of 500 double-spaced
pages of text.  A single gigabyte of storage space, or 1,000
megabytes, is the equivalent of 500,000 double-spaced pages of
text.  Storage devices capable of storing fifteen gigabytes of
data are now commonplace in desktop computers.  Consequently,
each non-networked, desktop computer found during a search can
easily contain the equivalent of 7.5 million pages of data,
which, if printed out, would completely fill a 10' x 12' x 10'
room to the ceiling.

   d. Computer users can attempt to conceal data
within computer equipment and storage devices through a number of
methods, including the use of innocuous or misleading filenames
and extensions.  For example, files with the extension ".jpg"
often are image files; however, a user can easily change the
extension to ".txt" to conceal the image and make it appear that
the file contains text.  Computer users can also attempt to
conceal data by using encryption, which means that a password or

device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

        32.  In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

        a.  An FBI computer expert will be a member of the search team, and if possible, will make a duplicate copy of the hard drive of any computer and of any files on any storage devices found in PREMISES 1, which the search team will transport to an appropriate law enforcement laboratory for review.  If this procedure is successful, any computer or storage devices found in PREMISES 1 will not be physically removed from the premises.  If this procedure is not possible, any computer equipment and storage devices found in PREMISES 1 will be seized and transported to an appropriate law enforcement laboratory for review.  In addition, any computer equipment and storage devices

36

found in PREMISES 2, 3 and 4 will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

b.      The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

33. Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offense specified

above.

34.  In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

35.  If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will promptly return these items, upon request, within a reasonable period of time.

36.  In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

a.  Any computer equipment and storage device capable of being used to commit, further or store evidence of the offenses listed above;

b.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data,

including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

   c. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones;

   d. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

   e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

   f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

   g. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

37.  Accordingly, pursuant to Federal Rule of Criminal Procedure 41, I respectfully request permission to search PREMISES 1 for the items set forth in Attachment A, and PREMISES 2, 3 and 4 for the items set forth in Attachment B.


J. KEVIN O'DONNELL
Special Agent
Federal Bureau of Investigation


Sworn to before me:
January _3_, 2007

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

40

## ATTACHMENT A

### PROPERTY TO BE SEIZED AT PREMISES 1

a.  Any and all documents related to mortgage and/or home equity loan applications and the procurement of such mortgages or loans in which AGA Capital, Northside Capital, Lending Universe, or Rigonda Financial served as the mortgage broker.

b.  Any and all items, including but not limited to signature and notary stamps, used in the procurement of mortgage and/or home equity loans in which AGA Capital, Northside Capital, Lending Universe, or Rigonda Financial served as the mortgage broker.

c.  Tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives, other computer-related equipment, such as digital cameras and scanners, and computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, RM and MPEG), and the data within the aforesaid objects relating to said materials, which may be, or are, related to the mortgage fraud scheme.

d.  Envelopes, letters, and other correspondence, including without limitation electronic mail, chat logs, and electronic messages, diaries, notebooks, notes, telephone call records, cellular call records, facsimile cover sheets and call records, and other records reflecting personal or telephonic contact with other individuals involved in the procurement of mortgage or home equity loans through the preparation, submission or approval of false or misleading mortgage or loan applications.

e.  Records that identify co-conspirators in the preparation, submission or approval of fraudulent mortgage applications, such as address books, telephone books, computerized organizers, business cards, telephones, cellular telephones and pagers, including

41

any information and/or data contained within the memory
of such devices, personal notes reflecting telephone
and pager numbers, and records of bank accounts
belonging to co-conspirators.

f.    Financial records of all types, stored in both tangible
and electronic form, including but not limited to
account statements, ledger books, records of
disbursements, canceled checks, wiring instructions and
correspondence that relate to the procurement of
mortgage or home equity loans through false or
misleading means.

g.    Books, records, receipts, bank statements, other bank
records, money drafts, letters of credit, money orders,
cashier's checks, passbooks, bank checks, safe deposit
box keys, and other items evidencing the obtaining,
secreting, transfer, concealment, and/or expenditure of
money.

h.    Any of the above items (listed in sub-paragraphs (a)
through (g)) that are maintained within safes and other
closed or locked containers, including those that may
be further secured by combination and/or key locks of
various kinds.

## ATTACHMENT B

### PROPERTY TO BE SEIZED AT PREMISES 2, 3 and 4

a.  Any and all documents related to mortgage and/or home equity loan applications and the procurement of such mortgages or loans through the preparation, submission or approval of false or misleading mortgage or loan applications.

b.  Tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives, other computer-related equipment, such as digital cameras and scanners, and computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, RM and MPEG), and the data within the aforesaid objects relating to said materials, which may be, or are, related to the mortgage fraud scheme.

c.  Envelopes, letters, and other correspondence, including without limitation electronic mail, chat logs, and electronic messages, diaries, notebooks, notes, telephone call records, cellular call records, facsimile cover sheets and call records, and other records reflecting personal or telephonic contact with other individuals involved in the procurement of mortgage or home equity loans through the preparation, submission or approval of false or misleading mortgage or loan applications.

d.  Records that identify co-conspirators in the preparation, submission or approval of fraudulent mortgage applications, such as address books, telephone books, computerized organizers, business cards, telephones, cellular telephones and pagers, including any information and/or data contained within the memory of such devices, personal notes reflecting telephone and pager numbers, and records of bank accounts belonging to co-conspirators.

e.  Financial records of all types, stored in both tangible

43

and electronic form, including but not limited to account statements, ledger books, records of disbursements, canceled checks, wiring instructions and correspondence that relate to the procurement of mortgage or home equity loans through false or misleading means.

f.    Books, records, receipts, bank statements, other bank records, money drafts, letters of credit, money orders, cashier's checks, passbooks, bank checks, safe deposit box keys, and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money.

g.    Any of the above items (listed in sub-paragraphs (a) through (g)) that are maintained within safes and other closed or locked containers, including those that may be further secured by combination and/or key locks of various kinds.